STATE ex Rel. GALLAGHER et al., Relators, v. DISTRICT COURT et al., Respondents.

(Nos. 8,223 to 8,226.)

(Submitted June 16, 1941.   Decided June 24, 1941.)

[114 Pac. (2d) 1047.]

*Mr. George Y. Patten* and *Mr. Roy M. Keister,* for Relators, submitted an original and a reply brief; *Mr. Patten* argued the cause orally.

*Messrs. Lewis & Stotesbury,* for Respondents, submitted an original and a supplementary brief; *Mr. Howard M. Lewis* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

By these four petitions for writ of supervisory control or other appropriate writ, the relators seek the annulment of district court orders denying their motions to quash the service of summons upon them in four damage actions. These four petitions, like the four motions in the district court to quash service, have been consolidated.

On the 7th of November, 1940, an automobile which had left Bremerton, Washington, some time on the preceding day, was

wrecked four miles west of Bozeman. There were six persons in the car, some of whom were taken to the Bozeman hospital and four of whom have filed the damage actions in question. In the car were found some Illinois license plates, but how many of them does not appear from the record.

The complaints are virtually identical and each alleges that at the times in question the defendants, relators here, were engaged in the business of buying, selling and trading in autos at Bremerton, Washington; that plaintiff was in defendants' employ and with five other employees was hired to drive a used Mercury automobile from Bremerton, Washington, to Chicago, Illinois, upon defendants' business; that it was defendants' duty to furnish a safe automobile, but by their negligence they furnished and suffered to be used by plaintiff an automobile which they knew to be unsafe and dangerous, in that the brakes were improperly adjusted and the exhaust system defective; that they failed to warn plaintiff of the dangerous conditions and of the precautions to be used, and that while one of plaintiff's fellow employees was driving with due care the poisonous gas from the exhaust, by reason of the defects, leaked into the closed body of the car, rendered partly unconscious the occupants, including the driver, by reason of which the car while so driven and operated by the driver, in defendants' employ, swerved off the road; that the driver could not and did not stop it and plaintiff was severely injured. The only essential difference is that in one of the complaints it is alleged that the plaintiff was driving at the time of the accident.

Service was had upon the Secretary of State as attorney for the defendants under the provisions of Chapter 10, Laws of 1937, and the motions to quash the service were based upon four grounds, only two of which are urged in the petitions here, namely:

"(1) Whether, under the provisions of said Chapter 10 of the Laws of the Twenty-fifth Legislative Assembly of 1937, the service of summons is valid, and conferred jurisdiction over the persons of the relators, in view of the undisputed evidence that

at the time of the accident alleged in the complaint the automobile involved in said accident was owned and operated by Ralph D. Wilson, and was not operated by relators, or either of them, by themselves or their agent; and

"(2) Whether the provisions of said Chapter 10 of the Laws of the Twenty-fifth Legislative Assembly of the State of Montana of 1937 permit service of summons upon a nonresident defendant in a case where both plaintiff and defendant are nonresidents of the State of Montana, or whether the said Act was intended solely for the benefit of resident plaintiffs against nonresident defendants."

The motions to quash were based upon the records and files and "upon affidavits and oral evidence, if any, to be presented at the hearing." The defendants introduced as evidence the oral testimony of Wilson, one of the persons in the car at the time of the accident; a conditional sale contract by which immediately before leaving Bremerton with the other five men Wilson bought the car from defendants for $850, payable $250 down and the balance over a term of twenty-four months; the defendant's receipt for the down payment; and the affidavits of defendant Gallagher and of his office employee. The plaintiffs in the damage actions introduced as their evidence the affidavits of F. L. Morris, credit manager of the Bozeman hospital, L. E. Westlake, sheriff of Gallatin county, and R. E. Jones, a Montana highway patrolman. The defendants filed in rebuttal affidavits of Wilson and relator Gallagher.

The motions to quash having been denied, these applications were filed. In their returns to the alternative writs the respondents raise the contention that the defendants waived their special appearances and made general appearances by several acts, such as attacking the court's jurisdiction over the cause of action and not merely its jurisdiction over the defendants personally, by requesting additional time of the trial court, and by having the evidence and proceedings on their motions certified as bills of exceptions for use in these proceedings. However,

in view of our conclusions it will be unnecessary to consider these points.

The petitions are virtually identical; that in cause 8,223 alleges that an action was filed against relators by George Doyle and summons issued and served upon the Secretary of State of the State of Montana as their attorney under the provisions of Chapter 10 of the Laws of 1937; that both Doyle and the relators were and are nonresidents of Montana and residents of the state of Washington. Annexed to the petitions as exhibits are the complaints and the record of the proceedings and testimony on the motions to quash.

No question is raised as to the validity of the statute in question, which has already been approved by this court (*State ex rel. Charette* v. *District Court*, 107 Mont. 489, 86 Pac. (2d) 750, and *State ex rel. Thompson* v. *District Court*, 108 Mont. 362, 91 Pac. (2d) 422), or as to the due compliance with its provisions; the only questions being the two stated above. The first is a question of fact, which requires a summary of the evidence.

Wilson testified that he had not been employed since September 27, 1940; that on the morning of November 6, 1940, the day before the accident, he purchased the car in question from the relators under the conditional sale contract above mentioned, which, however, was not placed of record until November 9, 1940, two days after the accident. He testified in part as follows:

"Q. Going down to Salina, Kansas, weren't you? A. Yes. And Mr. Gallagher said he knew some people he wanted to ride with me and if I would go out of my way up to Chicago that they would buy some of the gas and help me drive. So I had a short time to get there and get back, so I figured that I would just drive day and night till I got there; I would save time. And if they helped me with some gas that would help me out, too.

"Q. And that was the occasion of their being with you on that trip? A. Yes." * * *

"Q. As a matter of fact, you and these other boys were going down to Chicago to drive back some new Oldsmobiles for Smith-Gallagher, weren't you? A. I wasn't.

"Q. Or Smith-Oldsmobile, or Gallagher? A. I wasn't. I I don't know what they were going for, or where they were going when they got there, or what they was going to do, or anything about them.

"Q. Did you talk over the purpose of this expedition with the men you have named, the two Doyles, Novak, Mulkey, Reed, or any of them? A. Did I what?

"Q. Did you talk over the purpose of this trip? A. No; uh, uh.

"Q. You never mentioned to them what the trip was for? A. Not what I was going for, because it was none of their business.

"Q. And you did not know what they were going for, did you? A. No, I didn't care. They told me when I picked them up that they were going to Chicago, and I says, 'Well, that is out of my way a little bit, but if they want to help me drive and pay for some of the gas, I will go out of my way some.'

"Q. Do you now say, on oath and in this court, that you and these other men were not hired by Smith Oldsmobile or Gallagher to go to Chicago and drive back certain new Oldsmobile cars? A. I say I wasn't. I didn't say nothing about them. I don't know what they were going to do.

"Q. You claim you do not know their purpose at all? A. It was not my purpose to go there and bring back cars. I don't know what their purpose was. I was going to Kansas."

He testified further that there were some Illinois license plates in his car; that he stayed at the Bozeman hospital for a week and then went back to Bremerton; that he had left some money with Gallagher and didn't know whether it was $50 or $500, but upon being pressed said it was "around $300.00"; that after the accident he called Gallagher by long distance telephone because he had never seen two of the other men before and just knew two others of them by sight and "was wanting to know

what to do with them." He paid for the meals, but denied that it was with Gallagher's money.

Wilson's testimony as to the purchase of the car was substantiated by the affidavits of the defendant Gallagher and of one of his employees at Bremerton, the first of which includes the statement that since making the conditional sale contract the defendant had had no right, title or interest in the car except as provided by its terms.

F. L. Morris, credit manager of the Bozeman hospital, testified by affidavit that in order to fix the responsibility for the hospital expenses he had asked Wilson about the ownership of the car and that Wilson had told him that it belonged to Gallagher, who had employed Wilson and the other occupants of the car to drive to Chicago and bring back five new cars; that while Wilson was still in the hospital he told affiant in substance, "Mr. Gallagher wants me to claim ownership of the Mercury car, but it is not my car. I know nothing about it." That Wilson repeatedly telephoned Gallagher asking for funds and for instructions about continuing the trip to Chicago for new cars; that after procuring information about the ownership of the car, affiant showed Wilson a slip bearing the owner's name and that Wilson said in substance, "It is Gallagher's car all right. It was taken out of the second-hand or used-car lot"; that when Wilson was brought to the hospital he left with affiant for safekeeping "a considerable sum in currency, and also a check, in a much greater sum," payable to Wilson and signed by Gallagher; that affiant asked to have these funds applied upon the hospital bill, but that Wilson refused, saying: "I can't do it. That is Gallagher's money. That is the only money we have for the expenses of this trip"; that thereafter Wilson drew $64 of the money deposited and paid it to Jack Reed, one of the men in the car at the time of the accident, with directions to take it and continue to Chicago to bring back one of the cars for which the trip had been planned; that just before leaving Bozeman Wilson said: "I suppose when I get back, Gallagher will want me to claim ownership of the car. But I

won't do it''; that he had left some money with Gallagher for safe-keeping, and that, ''Mr. Gallagher will want me to say that this fifty dollars was a deposit on the price of the car. It is not. I do not own the car. It is my money which he is keeping for me.''

The sheriff testified by affidavit that on the day of the accident he and Jones, the highway patrolman, asked Wilson who owned the car and that Wilson would give them no answer until after he had asked Gallagher by telephone, ''Who shall I tell them owns this car? They are asking me about that. What shall I tell them? They are standing right here—the Sheriff and the Patrolman''; that Wilson then informed them that the car belonged to Gallagher and that they were going to Chicago for the Smith-Oldsmobile company of Bremerton, Washington. The highway patrolman's affidavit was virtually identical with that of the sheriff.

In a counteraffidavit defendant Gallagher stated that in the telephone conversation mentioned in the affidavits of the sheriff and highway patrolman he had merely been asked to verify the fact that Wilson was lawfully in possession of the car, and that he told someone who represented himself as an officer about the conditional sale contract; that Morris thereupon asked him to guarantee the hospital expenses, but that he refused. He denied the conversation as stated by the sheriff and highway patrolman.

In a counteraffidavit Wilson denied the statements of the sheriff, the patrolman and Morris practically in toto. He also stated that in reply to Morris' inquiry he told Morris that legal title to the car belonged to the defendants and that he was buying it under conditional sale contract. He denied telling Morris that the relators had employed him and the other occupants of the car to drive to Chicago and ''bring back five new automobiles'' for the defendants; he denied Morris' affidavit about the telephone conversation and stated that Morris had suggested that gas leakage was the cause of the accident and had instigated the suits to pay the hospital expenses and get the men something

for themselves, that Wilson refused and said that Gallagher was not responsible, that the hospital declined to release the men until provision had been made for payment of the expenses, and that he therefore gave Reed enough money to pay his hospital bill so that he could be released and take steps for the release of the others, that he had a check for $175 drawn to his order by Gallagher which represented money saved by him, but that the hospital refused to accept it on the hospital bill, that he gave a promissory note and was released.

It is obvious that the service of summons was had under section 3 of the Act in question, which provides in part as follows: "The operation by any person, by himself or his agent, of any motor vehicle, whether registered or unregistered, and with or without a license to operate, on any public way in this State, shall be deemed equivalent to an appointment by such person of the secretary of state, or his successor in office, to be his true and lawful attorney upon whom may be served all lawful processes in any action or proceeding against him, growing out of an accident or collision in which he or his agent may be involved while operating a motor vehicle on any public way in this State, and such operation shall be a signification of an agreement by such person that any such process against him which is served upon the secretary of state or his successor in office shall be of the same force and validity as if served upon him personally."

In other words, the complaint sets forth an action purporting to have grown out of an accident or collision in which defendants' agent was "involved while operating a motor vehicle" upon a public highway within Montana. The validity and merits of the causes of action are not before us here, the only question being whether the highway accident out of which the suits have grown was one in which the defendants' agent was involved while operating a motor vehicle, so as to permit the service of process by the statutory method in question.

The chief contention in the record concerns the ownership of the car, but whatever its consequence at a trial upon the

merits it would seem to have little bearing upon the question presented on this proceeding. Obviously the question is not whether defendants owned the car but whether at the time it was being operated by their agent. The statute depends entirely, not upon ownership, but upon "the operation by any person, by himself or his agent," of the motor vehicle. The ownership by the driver rather than by the defendants might have some bearing upon the question of the driver's agency for them, but even that would not necessarily be conclusive, since they might make another their agent for the driving of a car belonging to a third person or even to the agent. But that question does not appear here, since at the time of the accident the car was apparently not being operated by Wilson, the conditional sale purchaser, but by one of the five men who were traveling with him pursuant to the arrangement made by Gallagher.

As the defendants themselves point out, under statutes of the kind in question here, the word "operate" or "operation" refers to the physical act of working the mechanism of the car. (*O'Tier* v. *Sell,* 252 N. Y. 400, 169 N. E. 624; *Brown* v. *Cleveland Tractor Co.,* 265 Mich. 475, 251 N. W. 557; *Flynn* v. *Kramer,* 271 Mich. 500, 261 N. W. 77.) Consequently, in the above-cited cases, the service was held not good as against one not personally operating the car; but the statutes interpreted in those cases did not, like ours, refer to "the operation by any person, by himself *or his agent.*" They are, however, authorities as to the meaning of the word "operation" in the absence of any reference to an agent, and the addition of the latter is merely to attribute to the principal the agent's actual manipulation of the car.

What we are concerned with, therefore, is not whether Wilson was defendants' agent, for he was not physically handling the car; but whether Doyle, the driver, was their agent for the purpose. Wilson's relationship to them is therefore not the issue, whatever bearing it may have upon it.

Furthermore, the defendants are the moving parties here, and the question is not whether the driver has been proven to be

their agent, but whether he has been proven not to be their agent, which must be established by them in order to prove that the case is not within the class in which service may be made under the statute in question, and therefore to entitle them to have the service quashed. Certainly, if there is any evidence from which the trial court could properly find that the agency relation existed, it cannot on account of a conflict in the evidence be placed in error for so doing.

The question thus resolves itself to this: Is there an entire ▮ absence of any credible evidence indicating that the driver at the time of the accident was an agent of the defendants? Looking back at the testimony of Wilson, upon whom they rely to disprove the agency, we find that it was the defendant Gallagher who wanted the men taken to Chicago and who made the arrangements for the trip, including the suggestion of their help in driving east; that after the accident Wilson called Gallagher to find out what to do with the men; that Wilson paid the expenses of the others en route to Bozeman, although he contended that it was not with Gallagher's money. His personal payment of their expenses hardly comports with his testimony that he took them in order to save money for himself on the trip; and he had some money and a check for $175 given him by Gallagher which, according to Morris, he said was Gallagher's and was to pay the expenses on the trip, although he himself denied the statement. There are a number of things left unexplained by his testimony, including the circumstance that although he bought the car for $850, paying $250 down and owing a $600 balance, he himself had a credit balance of some $300 on deposit with Gallagher in addition to approximately $250, $175 of which was in a check from Gallagher and which he insisted represented his own savings previously deposited with Gallagher. His complete ignorance as to the purpose why Gallagher wanted the other five taken east is also a little remarkable. His relation to Gallagher was left quite shadowy by his testimony; but there must have been some substantial arrangement, since to accommodate Gallagher he agreed

to go from Bremerton to Salina, Kansas (about 1,400 miles in a straight line), via Chicago (making it about 2,400 miles by two straight lines), thus almost doubling the distance. Whether Wilson's relationship to the defendants, if material, was as agent or independent contractor is not apparent from the record, and it certainly cannot be held as a matter of law to have been proven at the hearing that he and the others who operated the car, and especially George Doyle who was operating it at the time of the accident, were not the defendants' agents. Gallagher made three affidavits and had ample opportunity to explain away the apparent fact that Doyle and all of the others with the possible exception of Wilson were making the trip solely on defendants' business, but he very pointedly refrained from reference to the matter, or to the Illinois license plates which were found in the car. It seems clear, therefore, that we cannot find the trial court manifestly in error for its refusal to quash the service on that ground.

The other question is that of the legislative intent in enacting the statute. Defendants urge that it is intended "solely for the benefit of resident plaintiffs against nonresident defendants," but they have referred us to nothing in the Act, and we find nothing therein, indicating such an intent. They urge that the statute is in derogation of the common law and thus is to be strictly construed, citing several decisions from other jurisdictions in support of the contention. But that argument cannot be applicable in Montana, for section 4, Revised Codes, provides: "The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the codes or other statutes of the state of Montana. The codes establish the law of this state respecting the subjects to which they relate and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice."

It seems clear to us that the object of the Act is to further the safety of highway traffic within the state and afford a practicable remedy for damage arising from negligence on the

highways, by providing for service of summons within the state where it would otherwise be impossible, or virtually so. The Act cannot be construed liberally to effect that object by limiting its application to plaintiffs resident in Montana, and in absence of a direct provision in the Act to that effect, we cannot impute to the legislature an intent to discriminate in favor of resident plaintiffs and against nonresident plaintiffs. Ordinarily the better place for suit is where the accident occurred and where usually the evidence, physical and otherwise, will be available. If the plaintiffs had been residents of North Dakota, there would be no more reason why they should be compelled to go to Washington to sue than if they had been residents of Montana. There might be some reason where, as here, both plaintiffs and defendants were residents of Washington, but if so that is a matter of policy for the legislature to decide. In any event it seems clear from this analysis that the real question of policy arising from the circumstances of these cases is not that the plaintiffs are nonresidents of Montana, but rather that they happen to be residents of the same state as the defendants; and even assuming that the court might read into the statute an intention to protect only residents as distinguished from nonresidents, it is obviously not possible to read into it an intent to protect all but residents of the same state as the defendants, or all but residents living closer to the defendants' state than to Montana.

Not being able to construe the statute as inapplicable to nonresidents plaintiffs, nor to find it definitely proven that the operator of the automobile at the time of the accident was not defendants' agent, we must deny the writs prayed for herein, and it is so ordered.

ASSOCIATE JUSTICES ANGSTMAN, ERICKSON and ANDERSON concur.

MR. JUSTICE MORRIS: I dissent. I do not think the evidence, sufficient to establish the fact that the car was operated by an agent of the defendants at the time of the accident.